United States of America,  )
                           )   *E-FILED - 12/18/13*
          Plaintiff,       )
                           )
     v.                    )
                           )   No. CR—13-00201 DLJ
Ali Kashani and Yang Zhao  )
                           )
                           )
                           )
          Defendants.      )
_____)

Defendants Ali Kashani (Kashani) and Yang Zhao (Zhao) are charged jointly with Wire Fraud. Kashani is also charged with Money Laundering. They have each filed Motions to Dismiss Counts of the Indictment. The Court held a hearing on the Motions on October 17, 2013. Jeffrey Schenk appeared on behalf of the government; Ross Nabatoff, and Christian Picone appeared for defendant Kashani, and Ed Swanson appeared for defendant Zhao. Having considered the arguments of counsel, the papers submitted, the applicable law, and the record in this case, the Court hereby denies defendants' Motions.

I. BACKGROUND

    A.    <u>The SBIR Grant Applications</u>

Under the coordination of the Small Business Administration (SBA), a number of separate government agencies are authorized to award research grants to "small businesses" under a program known as the Small Business Innovation Research program (SBIR). The National Science Foundation (NSF) and the National Aeronautics and Space Administration (NASA) are two of the agencies authorized to fund such grants.

The funding for SBIR grants is given out in phases.  The SBIR program agencies award monetary grants for phases I and II of a program.[1]

Phase I makes awards of up to $150,000 for approximately 6 months support for exploration of the technical merit or feasibility of an idea or technology. Phase II awards grants of up to $1 million, for up to 2 years, to facilitate expansion of Phase I results. Phase II grants are awarded exclusively to Phase I award winners. Each grant requires the participation of a Primary Investigator (PI).

In 2006, the NSF put out a solicitation seeking applications for Phase I funding. (Kashani Ex.A). On June 12, 2006, Kashani's company, Atlas Scientific,[2] submitted an SBIR Phase I project proposal to the NSF entitled "Dry Thermal Adhesive Based on Carbon Nanotubes." The NSF granted Atlas Scientific the requested Phase I award for the period January 1, 2007 through June 30, 2007 in the amount of $99,991. Dr. Zhao was the PI on this proposal. In March 2007, during the conduct of the work of the Phase I NSF award, defendants attended a mandatory NSF training. The training materials stated that: "NSF will not make award that duplicate or substantially overlap research funded by other agencies" (Kashani Ex. B)(p.3). "You must disclose whether your company has: (1) received federal awards for related work, or (2) submitted or intends to submit proposals for similar work to

---

[1] Phase III is intended for commercialization and no further government funding is available for this phase.

[2] Dr. Kashani founded Atlas Scientific in 1991.  Dr. Zhao first became an employee of Atlas Scientific in 2006.

2

any other federal program." Id.  In July 2007, Zhao became a full time employee of UC Berkeley.

On July 6, 2007, NASA published a program solicitation. (Kashani Exh. K). On September 6, 2007, Atlas Scientific submitted an SBIR proposal to NASA for Phase I approval for a project entitled "Thermally Conductive Tape Based on Carbon Nanotube Array." NASA granted the funding proposal in the amount of $99,970 for the period January 21, 2008 through July 21, 2008. Dr. Zhao, while listed as personnel on the NASA funded project, was not the PI for that project. Throughout 2008 Zhao worked for UC Berkeley at what they referred to as 100% time.  (Opp. Exh. 2)

On January 31, 2008, Atlas Scientific submitted a proposal to NSF for a Phase II award. The proposal sought $499,993 for a 24 month period, and requested a starting date of July 1, 2008 for that project. The application contained the following certifications: (1) that "this proposal" is not being submitted to another Federal agency and that "NSF is the only Federal agency that has received this proposal(or overlapping or equivalent proposal) from the small business concern." The proposal also certified that the "primary employment of the PI will be with this firm at the time of the award and during the conduct of the research." (Opp. Exh. 5; Kashani Exh. J). (Kashani Exh. F at p. 3).

In May, 2008 Kashani established Atlas Nanotechnologies. (Kashani Exh G).  On June 5, 2008, Kashani alerted the NSF to the change in small business applicant name on the pending application.  NSF accepted the name change and subsequently

3

granted an award of $499,993 for the period 12/15/08-11/30/10.[3]

Dr. Kashani's Reply brief to this motion explains that although NSF accepted the change in Phase II grantee to Atlas Nanotechnologies, NSF directly wired the first Phase II grant payment into the bank account for Atlas Scientific, (Account #3494), which was no longer the small business conducting the project. When NSF was advised of this by Kashani, the parties agree that the funds could be transferred by Kashani from the Atlas Scientific account to the Atlas Nanotechnolgies account (Wells Fargo Account #0169). See Kashani Reply brief at P.12 n. 4. This is the transfer charged as a money laundering offense against Kashani in Count 6 of the Indictment.

On July 21, 2008, Atlas Nanotechnologies submitted a Phase II proposal to NASA. (Opp. Exh. 4/Kashani Exh. L). This application contained a Certification that "work under this project has been submitted for Federal funding only to NASA SBIR program" and that no "funding has been received for work under this project by any other Federal grant, contract, or subcontract". (p2.). It is this application which is set out in Count Two of the Indictment as evidence of Wire Fraud by Kashani. NASA granted the Phase II proposal in the amount of $599,927 for the period 2/5/09-8/04/11.

On June 22, 2009, Atlas Nanotechnologies filed an Interim report to NSF on its Phase II program. (Zhao Exhibit E) The report contains a Certification to NSF signed by both

---

[3] In December 2008, Zhao requested that her full-time employment at Berkeley be changed from 100% to 50% as of January 1, 2009. (Zhao Exh. B)

4

Kashani and Zhao that the primary employment of the PI is with Atlas Nanotechnologies, and that the "work under this project" had not been submitted for funding to another federal agency or funded by any other federal grant. This report is set out in Count Four of the Indictment, which alleges wire fraud by Zhao.

On December 27, 2009, Atlas filed another Interim report for the NSF Phase II grant for the period 7/1/09-12/31/09. (Kashani Exh. E). This report certifies that the PI is "primarily employed" by the grantee organization and that "work under this project" has not been submitted or funded under any other Federal Grant. This report is set out in Count 3 of the Indictment, alleging Wire Fraud by Kashani.[4]

On December 31, 2010, defendants filed a final interim report for the NSF Phase II grant (as funding had concluded). This report also certifies to NSF that the primary employment of the PI is with Atlas Nanotechnologies and that the research under this project proposal had not been funded by another federal agency. This report is set out in Count 5 of the Indictment, which alleges Wire Fraud by Zhao.

B. <u>The Indictment</u>

On March 27, 2013, the grand jury indicted Dr. Kashani and Dr. Zhao on six counts relating to the allegedly false statements and misrepresentations made in proposals and reports submitted to the NSF and NASA. The Indictment charged them with Wire Fraud, and Conspiracy to Commit Wire Fraud, in

---

[4] The Indictment lists the date of this report as 12/29/2009, while the copy of the report cover page attached as Kashani Exh. D has a date of 12/27/2009.

5

1  violation of 18 U.S.C. §§ 1343 and 1349.

2  The indictment asserts that, from 2008-2011, Drs. Kashani and Zhao created a scheme to defraud "NSF and NASA and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through two principal methods: (A) making materially false statements; and (B) failing to disclose material facts." Indictment, ¶15.

3  The indictment alleges that beginning in 2008, Drs. Kashani and Zhao made false and misleading statements to NSF and NASA in their grant applications and that they created the false and misleading appearance that they "had not submitted overlapping project proposals to NSF and NASA, and were not already receiving federal grant money for overlapping research projects[,]" when, according to the indictment, Drs. Kashani and Zhao "in truth... knew on or about January 31, 2008, when they applied for the NSF Phase II award that they were already receiving funding from a NASA Phase I award that lasted from January 21, 2008 through July 21, 2008." The Indictment specifically sets out the certifications made in the grant applications. Indictment, ¶¶16-19.

4  In addition, with respect solely to the NSF proposals and reports, the indictment charges that Drs. Kashani and Zhao misrepresented to NSF that Dr. Zhao, the principal investigator ("PI") on an NSF Phase II proposal, was "primarily employed" with Atlas Nanotechnologies and that Dr. Zhao's "primary employment" was with Atlas Nanotechnologies, when it was not. Indictment, ¶¶23-26.

5  The Indictment also alleges that Dr. Kashani, on January

6

26, 2009 transferred funds into "Atlas's Wells Fargo Bank Account #0169" in alleged violation of 18 U.S.C. § 1957, Money Laundering.  Indictment ¶ 28.

II. <u>Legal Standard</u>

Fed. R. Crim. P. 12(b)(2) permits a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). "A defense is 'capable of determination' if trial of the facts surrounding the commission of the charged offense would be of no assistance in determining the validity of the defense." <u>United States v. Malago</u>, 2012 U.S. Dist LEXIS 136958 at *5 (S.D. Fl. Sep. 25, 2012)(quoting <u>United States v. Covington</u>, 395 U.S. 57, 60-61 (1969)).

"If … a question is 'excessively vague, or 'fundamentally ambiguous,'' the answer may not, as matter of law, form the basis of a prosecution for perjury or false statement." <u>United States v. Culliton</u>, 328 F.3d 1074, 1078 (9th Cir. 2003), quoting <u>United States v. Ryan</u>, 828 F.2d 1010, 1015 (3d Cir.1987), citing in turn <u>United States v. Lighte</u>, 782 F.2d 367, 375 (2d Cir.1986), which cited <u>United States v. Lattimore</u>, 127 F. Supp. 405, 413 (D.D.C 1955).  The defendants argue that the Court may look at the NSF and NASA certifications to determine whether the certifications are fundamentally ambiguous without delving into the facts of the case.

With respect to criminal cases involving questions on applications, forms, or certifications, "a motion to dismiss the indictment should be granted when the application form or

7

question is 'so fundamentally ambiguous as to preclude a conviction as a matter of law.'" Malago, 2012 U.S. Dist. LEXIS 136958 at *5 (quoting United States v. Manapat, 928 F.2d 1097, 1100 (11th Cir. 1991)); see also United States v. Bussell, 414 F.3d 1048, 1057 (9th Cir. 2005).

III. Discussion

    A. Wire Fraud

There is a fundamental difference in the way the government and the defendants view this case.  Defendants look to the allegations of the Indictment and assert that while the government has charged the case as a wire fraud case, that it is, in fact, a false statements case.  The government counters that while that defendants did make statements the government alleges to be false, that those statements are not charged as individual offenses, but rather as part of the whole body of evidence which is necessary to prove the alleged scheme to defraud.

The difference in views affects the parties' proffered analysis of the case. Defendants' arguments for dismissal rely on a line of cases in which the underlying indictments were for false statements in violation of 18 U.S.C. § 1001.  In order to prove a violation of this section, in the context of this case, the government would have to show that the defendants: (1) knowingly and willfully; (2)made any materially false, fictitious, or fraudulent statement or representation.

Because of these requirements, the case law regarding false statements has developed such that where a question is

"excessively vague, or 'fundamentally ambiguous,' " the answer may not, as matter of law, form the basis of a prosecution for perjury or false statement. Ryan, 828 F.2d at 1015(citing United States v. Lighte, 782 F.2d 367, 375(2d Cir.1986)).[5] It is this last line of cases which defendants rely on in their motion.

Most of these cases focused solely on the answers that defendants had given to specific questions on applications, forms, or certifications and therefore the reviewing court was left to grapple with whether the application form or question was 'so fundamentally ambiguous as to preclude a conviction as a matter of law.'" Malago, 2012 U.S. Dist. LEXIS 136958 at *5 (quoting United States v. Manapat, 928 F.2d 1097, 1100 (11th Cir. 1991)); see also United States v. Bussell, 414 F.3d 1048, 1057 (9th Cir. 2005).

If the Indictment were for false statements, then the analysis proffered by defendants might be availing. However, the Indictment alleges a scheme of fraud which depends upon evidence which extends beyond mere false statements. By its nature, a wire fraud case is broader in scope, with the government seeking to prove a scheme to defraud which can include evidence of false or fraudulent pretenses, representations, or promises, but which does not require proof

---

[5] Generally speaking, the existence of some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statement prosecution. See United States v. Ryan, 828 F.2d 1010, 1015 (3d Cir.1987) abrogated on other grounds by United States v. Wells, 519 U.S. 482, 486 n. 3, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). It is for the jury to decide in such cases which construction the defendant placed on a question. See United States v. Slawik, 548 F.2d 75, 86 (3d Cir.1977).

9

of materiality or reliance.  As this is the nature of the charged offenses, determinations of the meaning of the terms and whether they establish a scheme to defraud are issues which will have to be resolved at trial by the jury.

### B. Money Laundering

To begin, the parties debate the impact of the Santos decision of the United States Supreme Court.[6] U.S. v. Santos, 553 U.S. 507 (2008).  In that case, over the course of many years Santos operated an illegal lottery in Indiana. Santos employed helpers to run the lottery. These runners gathered bets from gamblers, kept a portion of the bets as their commissions, and delivered the rest to Santos's collectors. Collectors then delivered the money to Santos.  Santos, in turn used some of the money to pay the salaries of collectors, as well as to pay the winners.

These payments to runners, collectors, and winners formed the basis of a 10-count indictment against Santos, Diaz, and 11 others for counts related to running an illegal gambling business and money laundering.  These convictions were upheld on appeal, but Santos and Diaz subsequently brought motions under 28 U.S.C. § 2255, collaterally attacking their convictions and sentences based on the Seventh Circuit's decision in United States v. Scialabba, 282 F.3d 475 (2002), which held that the federal money-laundering statute's prohibition of transactions involving criminal "proceeds"

---

[6] Santos did not stay with us for very long. Section 1956 was amended in May, 2009 to specifically include "gross receipts" in the term "proceeds."  The amended statute, however, became effective after the events charged in this case and Santos remains for our consideration.

10

applies only to transactions involving criminal profits, not criminal receipts.

In Santos, the defense contended that the term "proceeds" used in the money laundering statute, 18 U.S.C. 1956(e) ["1956"], for which he had been convicted, should be interpreted to mean "profits" rather than "gross receipts" when applied to the funds involved in the offense. The Supreme Court found that the term "proceeds" is susceptible to both interpretations, and applying the rule of lenity, found the laundered funds must be found to be "profits" in order to establish a violation of the statute.[7]

The Supreme Court therefore conducted an extensive analysis of the meaning of the term "proceeds" in light of the harsh penalties attached to a conviction for money laundering. Although the government argued that proceeds should mean receipts, the Supreme Court stated that:

> If 'proceeds' means 'profits,' one could say that the statute is aimed at the distinctive danger that arises from leaving in criminal hands the yield of a crime. A rational Congress could surely have decided that the risk of leveraging one criminal activity into the next poses a greater threat to society than the mere payment of crime-related expenses and justifies the money-laundering statute's harsh penalties.

Id. at 2026.

The Supreme Court went on to note that the merger problem was not limited to lottery operators and that:

> For a host of predicate crimes, merger would

---

[7] Sections 1956 and 1957 are companion money laundering statutes and courts have found that the term "criminally derived property" in 1957 is to be interpreted to be the same as the term "proceeds" in 1956.

11

>  depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds—for example, the felon who uses the stolen money to pay for the rented getaway car—would violate the money-laundering statute.

Id. at 2027

These determination of "profits" versus "receipts" is an issue often left to the fact-finder to determine. Id. at 2029. (Fact-finder need only consider whether the receipts from the charged unlawful act exceeded the costs fairly attributable to it).

In this case, at this stage of the proceedings, the following factual circumstances are before the Court. Kashani is charged with the crime of money laundering, committed on January 26, 2009.  The Indictment states that he transferred funds into "Atlas's Wells Fargo Bank Account # 0169."

The Indictment does not set out any further factual context, but that context has been more fully developed by the discovery in the case, which has been described by the parties in their briefs to the Court. That factual context shows that Kashani, pursuant to the SBIR program, applied to the NSF for Phase II funds related to a carbon nanotube research project on January 31, 2008.  He had already applied for, been awarded funds and completed Phase I of that project as of June, 2007. The project had been conducted by a small business owned by Kashani called Atlas Scientific.  During the time his Phase II application was pending, Kashani replaced the small business designated in the application, Atlas Scientific, with a new

12

small business called Atlas Nanotechnologies.

NSF was informed of this and approved the small business change and continued consideration of the Phase II proposal under the name of the new small business. NSF ultimately approved the Phase II proposal and funding began on December 15, 2008. However, when NSF made its first payment to Kashani in January 2009, it mistakenly sent the funds to Wells Fargo Account #3494 which was an Account for the old Atlas Scientific business. When Kashani discovered the error he notified NSF and it was agreed that the error could be simply corrected by Kashani transferring the funds from account #3494 to the Atlas Nanotechnologies account #0169.[8] This is the monetary transaction which is charged as money laundering under 18 U.S.C. § 1957(a)[hereafter "1957"] on the premise that those funds had been derived from mail fraud.

Kashani argues that the funds in this case are not alleged to be "profits" and that means the charge should be dismissed. The government argues that the fraud in this case had been completed when the NSF funds reached the first account and that the subsequent transfer should not be considered a "merger." The government cites the fractured decision in Santos - there were 5 votes to reverse the conviction but only 4 of them agreed on the "lenity" rationale for the decision - and also cites subsequent cases, to argue that the "profits" limitation should only apply to those cases where the conduct underlying the money laundering offense is a "central

---

[8] If the original NSF transfer had been to the Atlas Nanotechnologies account, there would obviously have been no money laundering.

13

component" of the fraud conviction thus creating an improper "merger" of the charges which would allow the fraud offense to be punished at a higher level than it would be if punished for the fraud itself.  See U.S. v. Van Alstyne, 584 F.3d 803 (9th Cir. 2009).

The Court does not agree that the facts described support this analysis.  However, as the Court finds the money laundering count has been sufficiently pleaded, any further factual or legal argument concerning the subject of "profits" is premature at this juncture.  There might well come a time where presentation of the facts is such that a determination that these funds were receipts and not "profits" can be had and the Court could find that the money laundering count had indeed merged with the substantive wire fraud count, but such is not currently the state of the record. [9] [10]

---

[9] Under Rule 29 of the Federal Rules of Criminal Procedure, a court can dismiss any count before it is submitted to the jury on the finding that the evidence is insufficient,

[10] There is also a question, not currently before the Court as to whether the defendant has conducted a "monetary transaction." A § 1957 violation requires that the defendant must knowingly "engage" in a monetary transaction and that defendant must "conduct" the monetary transaction involved. See e.g. U.S. Attorney's Manual § 2101. In criminal responsibility terms this means that the defendant must directly carry out the monetary transaction or indirectly participate in the conduct of the monetary transaction.  Here, the monetary transaction involved is the deposit by NSF of funds it owed to Kashani for his work on the Phase II project.  Even if you view Kashani's transfer to his #0691 account from his #3494 account as independent from any conduct by NSF, the effect is to keep the money in his own account, and it is not clear to the Court that this is the sort of monetary transaction which is covered by the money laundering statutes.

ACCORDINGLY, the Court finds that the present motions to dismiss the wire fraud and money laundering counts are DENIED.

IT IS SO ORDERED.

Dated: December 17, 2013   _____

D. Lowell Jensen
United States District Judge

Copy of Order E-Filed to Counsel of Record: